**SO ORDERED.**

**SIGNED this 23rd day of July, 2013.**

Robert E. Nugent
United States Chief Bankruptcy Judge

---

OPINION DESIGNATED FOR ONLINE PUBLICATION
BUT NOT PRINT PUBLICATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| **A-1 PLANK & SCAFFOLD MFG, INC.** | ) | **Case No. 10-10379** |
| | ) | **Chapter 7** |
| **Debtor.** | ) | |
| **CARL B. DAVIS, TRUSTEE** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Adversary No. 12-5038** |
| **SUNFLOWER BANK, N.A.** | ) | |
| **Defendant.** | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT**

Motions for leave to amend a complaint should be freely granted in the interest of justice. But amendments proposed more than 21 days from the filing of an answer are not always granted, particularly when they have been proposed well after the time scheduled for amendments, discovery has closed, and pretrial order deadlines set in the scheduling order have passed. Denial of a motion for leave to amend is appropriate when the moving party: (1) cannot explain the delay; (2) knew or should have known the facts underlying the amendment when the original complaint was filed; (3) makes the complaint a moving target; (4) attempts to salvage a lost cause; or (5) knowingly delayed raising the issue until the eve of trial.

In this case, the movant, a successor bankruptcy trustee, relies on the non-disclosure of a document to his predecessor as the basis for adding the novel legal claim that transfers to the defendant Sunflower Bank, already targeted as § 548(a) fraudulent transfers, were also preferences paid to the Bank within one year of the petition date.[1] The trustee necessarily asserts, for the first time, that the Bank was "in control" of the debtor and is, accordingly, a statutory insider.[2] The insider "control" claim is based on a supposedly elusive document. The trustee also seeks to have this amendment relate back to the date of the original complaint, particularly important here as more than three years have passed since the underlying bankruptcy case was

---

[1] Instead of the usual 90-day look back period for preferences, § 547(b)(4)(B) expands the look back period to 1 year preceding the date of filing where the creditor was an insider at the time of the transfer.

[2] *See* § 101(31)(B)(iii).

filed and the § 546 statute of limitations has otherwise expired.[3] After careful review of the supposedly undisclosed document, I conclude that its contents were incorporated verbatim into the additional terms of a promissory note signed by the debtor's officers, a copy of which was filed with the Bank's first proof of claim on June 22, 2010,[4] and which was known well enough to the first trustee to fuel his request for clarification concerning the document's meaning from the Bank's then counsel. Indeed, the first trustee filed a complaint that referred to the control accounts referenced in the document and sought to recover these same transfers as fraudulent, but did not plead a § 547 insider preference claim. As explained below, the trustee's motion to amend should be denied because the estate's delay in pleading this new claim is unexplained and the estate knew of this agreement long before the pleading and discovery deadlines passed (knowledge with which this trustee is charged), making the complaint a "moving target."[5]

***Facts***

The A-1 bankruptcy case began February 21, 2010 in chapter 11 and a liquidating chapter 11 plan was confirmed on June 8, 2011. J. Michael Morris was

---

[3] *See* Fed. R. Civ. P. 15(c) made applicable to adversary proceedings by Fed. R. Bankr. P. 7015.

[4] *See* Proof of Claim No. 60-1.

[5] *See Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 800 (10th Cir. 1998) (leave to amend sought 19 months after filing the original complaint and after trial court had orally ruled on summary judgment motion termed "a moving target" by the trial court). The trustee Davis appears by his attorney Kenneth Jack. Sunflower Bank appears by its attorney Michael P. Alley.

appointed liquidating trustee. He commenced administration and, on February 21, 2012, two years to the day after the case was filed, he filed this six count adversary proceeding. In Count IV of his complaint, he alleged that on October 30, 2009, the debtor signed note 1296 with the Bank and that the note contained an agreement by which the debtor agreed to borrow the cash value of certain life insurance policies and deposit them to a "[Bank] controlled account for the payment of operating expenses."[6] He further pled that some of these proceeds were applied to the debts of the debtor or of another company affiliated with the debtor (A-1 Shoring) and sought to recover those payments as actual fraudulent transfers under § 548(a)(1)(A). Mr. Morris sought to avoid other transfers as preferences in other counts of the complaint, but nowhere did he allege that Sunflower Bank "controlled" the debtor or that the Bank is an insider.

On April 30, 2012, the case was converted to chapter 7 and Mr. Morris appointed chapter 7 trustee.[7] On May 16, I entered an order in the adversary proceeding adopting the parties report of planning meeting,[8] setting three critical deadlines that figure prominently in this Order: a Fed. R. Civ. P. Rule 26(a)(1) initial disclosures deadline of May 25, 2012, a deadline to amend pleadings of July 13, 2012, and a discovery deadline of September 28, 2012. Of these three deadlines, only the discovery period has been extended and it terminated on November 29, 2012.[9] Thus, for Fed. R. Civ. P. 16

[6] *See* Adv. Dkt. 1, p. 4, ¶ 16.

[7] Dkt. 481.

[8] Adv. Dkt. 11, 12.

[9] Adv. Dkt. 15.

scheduling purposes, discovery has been closed in this case for seven months and the pleadings have been closed for a year. On December 21, 2012, the parties jointly moved to extend the pretrial order deadline to February 1 and the dispositive motions deadline to February 15, 2013; the Court granted the requested extensions.[10]

On January 10, 2013, Mr. Morris resigned as trustee and Mr. Davis was appointed to succeed him. The resignation may have been prompted by the Bank's discovery that Morris's firm had advised it concerning a transaction unrelated to this case, though the record is sparse concerning the details or the timing of that discovery. On January 28, 2013, Mr. Davis's firm was employed to represent the estate in this and other matters. On January 30, the same day Davis was substituted as party plaintiff, he filed a motion to extend the final pretrial order deadline to April 4 and the dispositive motion deadline to April 18.[11] He neither sought to reopen discovery or to extend the time in which to amend the complaint, both of which had long since expired. An order extending the dispositive motion and pretrial order deadlines was entered without objection.[12] Davis filed this motion to amend the complaint on April 3.[13] Sunflower Bank filed its motion for summary judgment on April 18.[14] Both parties

---

[10] Adv. Dkt. 20, 21.

[11] Adv. Dkt. 24.

[12] Adv. Dkt. 26.

[13] Adv. Dkt. 29.

[14] Adv. Dkt. 33. During the pendency of this amendment motion, the parties completed briefing on the summary judgment motion and it was recently placed under advisement.

have briefed the amendment motion and the matter is ripe for decision.

***The Proposed Amendment***

Davis seeks to amend Count III of the complaint to add allegations that Sunflower Bank was an insider of the debtor by virtue of a "control agreement" and "relationship of control" between the Bank and the debtor. Because of that relationship, Davis seeks to invoke the 1-year look back period from the petition date and recover as a preference, the transfer of $647,397 of life insurance proceeds borrowed by A-1, deposited in the control account, and applied to A-1's and A-1 Shoring's debts.[15] These appear to be the same transfers that Mr. Morris sought to avoid in Count IV as fraudulent under § 548(a)(1)(A). Davis justifies the late amendment with a series of arguments directed at the Bank's conduct in allegedly not disclosing the "control agreement" until it filed its summary judgment motion on April 18 and securing Morris's resignation shortly before the previous set of deadlines were about to expire. Davis argues that because the Bank had possession of the control agreement and kept it from Morris, the balance of harm weighs heavily in favor of the trustee and that the Bank will not be prejudiced by any delay that allowing the amendment might cause. Moreover, Davis argues that without possession of the agreement, Morris could not have known of the insider relationship and, naturally, could not have pleaded it in the first complaint. The Bank says that Morris and it participated in lengthy and cooperative informal discovery throughout his

[15] *See* § 547(b)(4)(B).

administration. Indeed, the Bank says it gave Morris over 3,400 pages of documents. Davis says that when he received Morris's file, it contained over 7,600 pages of documents. Curiously, neither party takes a definitive position on whether the control agreement was contained in these behemoth files.[16] But before we dispose of that issue, we should first address what the "control agreement" is and whether Morris had notice of its content in time to allege anything about it in the original February 21, 2012 complaint or to amend it by the July 13, 2012 amendment deadline.

***The "Seven Party Agreement" and Promissory Note 1296***

Resting in the bankruptcy clerk's safe are the sealed exhibits to the Bank's summary judgment motion, all 896 pages of them. Among them is Exhibit 39, a document titled "A-1 Plank & Scaffold Mfg. Inc/A-1 Scaffold & Shoring, LLC/Allenbaugh Family, L.P. Memo Agreement October 9, 2009."[17] We will refer to this agreement as the trustee does, the "Seven Party Agreement" or "7PA." In the 7PA, the Bank agrees to "cover the payroll expenses for" the A-1 entities and the family

---

[16] It is not apparent that the documents produced by the Bank to Mr. Morris during informal discovery were bate-stamped or indexed in some fashion to identify those documents produced by the Bank in discovery. Nor is it apparent that Mr. Morris indexed the documents he received in discovery from the Bank to identify the documents produced by the Bank. The Court observes that the summary judgment exhibits are paginated with a letter/6 digit number stamp. For example, Exhibit 39 (the so-called "control agreement") is marked SFBMSJ000418-422, presumably identifying it as a Sunflower Bank Motion for Summary Judgment document. The parties' identification or indexing of documents produced and received in discovery is a common and prudent litigation practice that eliminates any confusion or dispute whether a particular document was produced, particularly in a document-intensive case.

[17] Dkt. 36, Ex. 39, pp. 419-422 (sealed).

partnership for October 9, 2009 in exchange for, among other things, the two A-1 entities and the Allenbaugh family (their owners) agreeing to borrow the cash value of life insurance policies owned by A-1 Plank, pay a second mortgage of Dwight and Jenny Allenbaugh, and deposit the balance in the "Sunflower Bank controlled operating account."[18] The policies were also to be assigned to the Bank as collateral. Under another part of the agreement, other cash generated by the entities was to be deposited in the controlled accounts with 70% being applied to the entities' respective bank debt and the remainder retained by the entities for the payment of current expenses as specifically approved by the Bank. The 7PA contains a number of other very typical workout agreement terms and conditions, all of which are quite favorable to the Bank. The 7PA specified that it was "in force for no more than 90 days."

The claims register in this case contains Claim 60-1 of Sunflower Bank, filed in June of 2010. Attached to that document is a copy of promissory note 1296, the "Note," which incorporates the 7PA by reference *and* verbatim at paragraph 11 nearly the entire text of the 7PA,[19] except that the provisions for the collateral assignment of the insurance policies and several other matters not germane to this motion have been stricken through and initialed by the makers, A-1's officers and guarantors. So the substance of the 7PA has been of record in this case since June 2010 – before Morris's appointment as liquidating trustee.

---

[18] *Id.* at ¶ 2.

[19] Paragraph 11, Additional Terms, recites ¶ 2-10 of the 7PA and the reporting requirements, but omits ¶ 1, not relevant here. *Cf.* Ex. 39 and Note, ¶ 1.

Davis implies that neither he nor Morris ever got the 7PA in disclosure or discovery. He notes that Sunflower never filed a certificate of compliance with the initial disclosure deadline as our local rules require. Indeed, neither party filed any certificates concerning discovery matters. And, neither ever complained to the Court about the other's failure to comply with discovery requirements of any kind. Sunflower suggests in its brief that all pre-complaint investigation as well as post-complaint discovery was done informally and cooperatively among counsel. Davis's brief contains a copy of a correspondence thread between Morris and Linda S. Parks, Esq., another of the Bank's counsel, in which Morris asks specific questions about the existence of a control agreement or arrangement that can only have been prompted by his review of the Note, if not the 7PA itself. This correspondence took place in July of 2011, well before the complaint was filed.[20] In a letter dated July 12, Morris asks about the insurance policies, the borrowing against them, and how those proceeds were spent. He notes –

> Beginning in October, 2009, it appears SFB [Bank] "controlled" the A1P accounts at SFB. . . Did anyone at the Debtor have any control or discretion over these transfers? *** Also there are several disbursements for "expenses approved" and "debit force post." Explain the process for obtaining "approval" of an "expense." Were any "expenses" presented and denied "approval?"[21]

Attorney Parks responded that "SFB had the type of control contemplated by KSA 84-9-312(b) . . . in that there [sic] it had a security interest in a deposit account perfected

---

[20] Adv. Dkt. 53, Ex. C and D.

[21] Adv. Dkt. 53, Ex. C.

by control . . . [b]ut we cannot say that the debtor had no control or discretion."[22] She went on to note that "[a]s a part of these negotiations, *the parties entered into a memo agreement with A1 Plank* and their respective guarantors."[23] Even if Morris didn't know about the 7PA before he wrote his letter of July 12, Parks's response placed him on notice of its existence shortly thereafter. And, as noted above, even if Morris didn't have possession of the 7PA then, he certainly knew of its provisions, likely from his review of the Bank's proof of claim and the contents of the Note.[24]

Morris's original complaint also demonstrates that he knew of the existence of the contents of the 7PA as they were quoted in the Note. He referred to the payment of the insurance loan proceeds into the "bank controlled" account and asserted that the application of those funds to A-1 debts was an avoidable fraudulent transfer. He had no less information at hand about the matter of control than does Davis today. That allows me to conclude that Morris, for whatever reason, opted not to assert that the Bank was an insider of the debtor or that these payments were avoidable preferences.

***Applying Rule 15's Standards for Allowing or Denying an Amendment***

Fed. R. Civ. P. 15(a)(2) provides that, after a responsive pleading has been filed, "a party may amend its pleading only with the opposing party's written consent or the

---

[22] Adv. Dkt. 53, Ex. D.

[23] *Id.* Emphasis added.

[24] As noted previously, paragraph 11 Additional Terms of Note 1296 attached to the Bank's proof of claim incorporates by reference "THE TERMS, CONDITIONS, AND REQUIREMENTS OF THE MEMO AGREEMENT DATED OCTOBER 9, 2009."

court's leave."[25] Leave to amend is to be "freely given when justice so requires."[26] Granting leave to amend rests in the sound discretion of the court.[27] Although Rule 15 should be interpreted with extreme liberality, leave to amend is not to be granted automatically. In *Foman v. Davis*,[28] the Supreme Court held:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.'[29]

The Tenth Circuit Court of Appeals has held that denial of leave to amend is appropriate when the amending party: (1) has no adequate explanation for the delay;[30] (2) knows or should have known of the facts upon which the proposed amendment is

---

[25] Fed. R. Bankr. P. 7015 applies Rule 15 to adversary proceedings.

[26] Fed. R. Civ. P. 15(a)(2).

[27] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971).

[28] 371 U.S. 178 (1962).

[29] *Id.* at 182, quoting Fed. R. Civ. P. 15(a).

[30] *Minter v. Prime Equip. Co*, 451 F.3d 1196, 1206 (10th Cir. 2006); *Frank v. U.S. West*, 3 F.3d 1357, 1365-66 (10th Cir. 1993); *see also Durham v. Xerox Corp.*, 18 F.3d 836, 840 (10th Cir. 1994) ("[U]nexplained delay alone justifies the district court's discretionary decision."); *Fed. Ins. Co. v. Gates Learjet Corp.*, 823 F.2d 383, 387 (10th Cir. 1987) ("Courts have denied leave to amend in situations where the moving party cannot demonstrate excusable neglect. For example, courts have denied leave to amend where the moving party was aware of the facts on which the amendment was based for some time prior to the filing of the motion to amend.")

based but failed to include them in the original complaint;[31] (3) makes the complaint "a moving target;"[32] (4) attempts to "salvage a lost case by untimely suggestion of new theories of recovery;"[33] or (5) "knowingly delay[] raising [an] issue until the eve of trial."[34] Several of these factors militate toward denial of the proposed amendment while others are not implicated on the record before the Court.

As to the lack of an adequate explanation for the delay, Davis relies on the alleged unavailability of the 7PA to Morris and himself to explain the need to amend the petition. But as noted above, the content of the 7PA has been in the record of this case since at least the time of the filing of the Bank's claim. That Morris knew the facts upon which the proposed amendment is based is shown by his specifically seeking to recover the same transfer as a fraudulent one in count IV, based upon the same facts. Presumably he made a prudential judgment, after his assessment of the Bank controlled account and inquiry of Ms. Parks, not to seek avoidance of these transfers

---

[31] *State Distribs., Inc. v. Glenmore Distilleries Co.*, 738 F.2d 405, 416 (10th Cir. 1984).

[32] *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 800 (10th Cir. 1998) (Where leave to amend sought 19 months after filing the original complaint and after trial court had orally ruled on summary judgment, trial court termed the case "a moving target.").

[33] *Id.; Pallottino v. City of Rio Rancho,* 31 F.3d 1023, 1027 (10th Cir. 1994) (Trial court not required to consider theories seriatim; denial of leave to file second amended complaint to add new theory was not an abuse of discretion where previous legal theory was dismissed, leave filed 8 months after original complaint and not based on newly discovered evidence previously unavailable).

[34] *Walters v. Monarch Life Ins. Co.*, 57 F.3d 899, 903 (10th Cir. 1995).

as one-year preferences and nowhere in the original complaint is there an allegation that the Bank is an insider of the debtor. Certainly adding this new allegation at a stage in the case after the amendment period and discovery are closed, and a summary judgment motion is pending, serves to make the complaint a "moving target." The trustee would still need to prove under this new insider-preference theory that merely requiring a "control account" renders a secured creditor an insider.

A-1 was a corporation. Section 101(31)(B) defines an insider of a corporation as a director, an officer, or a "person in control" of it. A "person" is defined as, among other things, a corporation. The trustee would have to show that the Bank actually controlled the debtor to prove that per se insider status. A "non-statutory" insider is one whose relationship to the debtor is not specifically enumerated in § 101(31), but who is closely related to the debtor and who deals with the debtor at less than arm's length.[35] To demonstrate that, the trustee would need to show "on the evidence [that the Bank] remained in control of the company."[36] Only if insider status could be established would the trustee be able to avoid and recover the alleged transfers that occurred more than 90 days before the A-1 case was filed.

Given that the summary judgment motion is pending and its merit not yet evaluated, I am unwilling to speculate whether the original claim directed at the

---

[35] *In re U.S. Medical, Inc.*, 531 F.3d 1272, 1278 (10th Cir. 2008) (Close relationship alone is insufficient to find a non-statutory insider, not dealing at arm's length is also required.).

[36] *Rupp v. United Security Bank (In re Kunz)*, 489 F.3d 1072, 1079 (10th Cir. 2007).

insurance proceeds transfers (count IV) is somehow faulty, or whether Davis seeks to add this new insider-preference claim to "salvage a lost case." Nor is there any suggestion that Davis has "knowingly delayed" raising the insider issue. But at this stage of the proceedings, where a summary judgment motion has been fully briefed, where formal discovery has been closed, and where informal discovery (albeit by Davis's predecessor) has been voluminous, adding an insider-preference claim that is predicated on establishing that the Bank "controlled" the debtor would require me, in fairness, to reopen discovery and table the summary judgment motion as well as the final pretrial order, resulting in considerable delay to all parties.[37] In so concluding, I distinguish between affording the successor trustee some latitude in responsive briefing and trial preparation given his relative newness to the adversary proceeding and allowing him to restart the entire pretrial process by adding a new and potentially contentious claim – one that his predecessor declined to plead. In short, *Foman* makes clear that leave to amend is to be "freely" given, but not automatically allowed. It should not be allowed here.

***Successor Trustee Bound by Predecessor Trustee's Acts***

Section 323(a) makes trustees the representatives of the bankruptcy estate who may sue and be sued on behalf of the estate. Avoidance claims are claims that trustees assert (or not) on behalf of the estate. That the estate is continuous notwithstanding the removal or resignation of a trustee is made clear by § 325 which states that a

---

[37] Indeed, the trustee acknowledges in his motion the necessity for supplemental discovery if his amendment is allowed. *See* Dkt. 29, ¶ 11.

vacancy in the office of the trustee "does not abate any pending action or proceeding" and the successor trustee is substituted automatically for the predecessor in any pending matter.[38] It is also clear that waivers made by a debtor in possession in chapter 11 bar the chapter 7 trustee of the same estate from pursuing actions waived even after conversion.[39] While no express waiver occurred in this case, Trustee Morris did not plead the insider-preference claim that Trustee Davis seeks to plead. That claim is now barred by § 546(a). Even though Morris clearly knew about the "controlled accounts," he opted not to allege on behalf of the estate that the Bank was an insider or assert a preference claim based on the insurance proceeds transfers. As a successor representative of the same estate, Davis is bound by that decision and its consequences.

***The Effect of "Disqualification"***

Davis also argues that the timing of Morris's resignation, which was apparently prompted by the Bank's discovery of Morris's law firm's prior representation of it on an unrelated matter, operated to deprive him, as successor trustee, of an opportunity to pursue this new legal theory. As support for that, the trustee includes transcribed e-mail traffic between two members of the U.S. Trustee's office setting the above information out. Davis's suggestion that the Bank's refusal to consent to Morris's

---

[38] Fed. R. Bankr. P. 2012(b).

[39] The Tenth Circuit has held that when a chapter 11 debtor in possession waives the right to bring an avoidance action against a secured lender, the chapter 7 trustee is bound by the same waiver. *See In re MS55, Inc.*, 477 F.3d 1131, 1135 (10th Cir. 2007).

continuing as counsel to the estate in this action ignores Morris's firm's potential ethical obligations to the Bank that could have arisen out of the prior representation (about which we know very little). It is certainly possible that the Bank's permission would have been necessary to Morris continuing and, while the timing is intriguing, that fact remains that when a lawyer is informed of a potential conflict of interest, even one that can be waived, he must either secure a waiver or withdraw.[40]

***Conclusion***

Trustee Davis's motion for leave to amend the complaint, dkt. 29, to assert an insider-preference claim relating to transfers of life insurance proceeds is hereby DENIED.

The Court will conduct a **status conference** in this matter on **September 19, 2013 at 9:50 a.m.** Counsel shall submit an agreed final Pretrial Order to the Court by **September 16, 2013** for its review.

# # #

[40] *See* KAN. SUP. CT. RULE 226, KRPC 1.9.